UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FISHERMAN'S FINEST, INC., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE HONORABLE CARLOS M. GUTIERREZ, as he is the Secretary of the United States Department of Commerce,<br><br>Defendant. | Case No. C07-1574MJP<br><br>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ON COUNTS ONE AND TWO OF PLAINTIFFS' COMPLAINT |

This matter comes before the Court on the parties' cross motions for partial summary judgment. (Dkt. Nos. 45, 46.) Plaintiffs' complaint challenges Amendments 85 ('A85') and 80 ('A80') to the Fishery Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area ('BSAI'). (Dkt. No. 6.) These motions for summary judgment only address counts one and two of the complaint which challenge A85's new allocations of the Total Allowable Catch ('TAC') of BSAI Pacific cod ('cod'). On October 21, 2008, this Court heard oral argument on the motions. The Court has considered the motions, the responses (Dkt. Nos. 58, 59), the parties' oral arguments, and other pertinent documents in the record. The Court GRANTS summary judgment for Defendant on counts one and two of Plaintiffs' complaint.

**Background**

The Court will first summarize the regulatory framework surrounding A85 then describe the specific factual circumstances of the amendment.

A. Regulatory Framework

The Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Stevens Act") established a framework for the Secretary of Commerce to regulate fishing in coastal waters. 16 U.S.C. §§ 1801, et seq. The act created regional fishery management councils responsible for preparing fishery management plans ("FMPs") and amendments to such plans. 16 U.S.C. § 1852. The North Pacific Fishery Management Council ("Council") holds broad powers to present restrictions and regulations governing fisheries from Oregon to Alaska. Id. The Council submits FMP amendments to the Secretary of Commerce and National Marine Fisheries Service ("NMFS"), who must review each proposal in accordance with codified standards ("National Standards"), see 16 U.S.C. §§ 1851(a)(1)-(10), the Magnuson-Stevens Act, and all other applicable law. 16 U.S.C. § 1854(a)-(b). Once the NMFS concludes their inquiry, they place a notice in the Federal Register and begin a sixty day comment period. 16 U.S.C. § 1854(a)(1). The Secretary has thirty days after the close of the comment period to approve, partially approve, or disapprove of the amendment. 16 U.S.C. § 1854(a)(3).

Two other statutes provide context for the Court's analysis. First, the American Fisheries Act ("AFA") granted certain vessels exclusive rights to harvest BSAI Pollock. Pub. L. No. 105-277, Div. C., Title II, §§ 205-213 (Oct. 21, 1998). Second, the parties base their definition of the fishing sectors (see below) on provisions in the Consolidated Appropriations Act which defines the requirements for participation in BSAI Pacific cod fisheries. Pub. L. No. 108-44, 118 Stat. 2809 (2004).

In 1994, the Council first recommended sector allocations of the TAC of Pacific cod with Amendment 24. 50 Fed. Reg. 4009 (Jan. 28, 1994)(codified at 50 C.F.R. pt. 679). Amendment 24 only delineated three sectors: fixed gear (pot or hook-and-line gear fishing), trawl gear, and jig gear sectors. Id. In 1997, Amendment 46 divided the trawl allocation between catcher vessels ('CV') and catcher-processors ('CP'). 61 Fed. Reg. 59029 (Nov. 20, 1996)(codified at 50 C.F.R. pt. 679). Amendments 64 and 77, passed in 2000 and 2003, respectively, further refined sector subdivisions from the original fixed gear sector into five groups. See 65 Fed. Reg. 51553 (Aug. 24, 2000)(codified at 50 C.F.R. pt. 679); 68 Fed. Reg. 49416 (Aug. 18, 2003)(codified at 50 C.F.R. p. 679). These amendments did not alter the TAC allocated to the trawl catcher-processor ('CP') group. See 72 Fed. Reg. 5654, 5655 (February 7, 2007)(proposed rule)(noting a 23.5% TAC quota for trawl CPs between 1997 and A85).

On September 4, 2007, the NMFS updated the FMP for groundfish of the BSAI with A85 which sets new allocations for the TAC of Pacific cod that each of nine sectors may catch annually. Fisheries of the Executive Economic Zone Off Alaska, Pacific Cod Allocations in the Bering Sea and Aleutian Island Management Area, 72 Fed. Reg. 50788 (September 4, 2007)(codified at 50 C.F.R. pt. 679). Plaintiffs point out that these allocations have a significant financial impact on fisheries as each percent of the TAC allocated represents approximately $2 million in revenue. (See Dkt. No. 46 at 6.) For the first time since the Magnuson-Stevens Act, trawl CPs were divided between AFA trawl catcher processors (part of the fleet granted pollock fishing rights under the AFA) and non-AFA trawl catcher processors (those who have no pollock fishing rights). 72 Fed. Reg. at 50788. Plaintiffs operate medium-sized, non-AFA trawl catcher processors, commonly termed the 'head and gut' sector in the industry. (Dkt. No. 46 at 1.)

ORDER - 3

B. Council's Fact Finding and Proposal

Originally, A85 began as a larger project to coordinate a multi-species fishing cooperative through A80. 72 Fed. Reg. at 5657; Memorandum from Robert D. Mecum, Acting Administrator, Alaska Region to William T. Hogarth, Assistant Administrator for Fisheries 171 (August 2, 2007)(hereinafter "AR Doc. 199"). The Council pursued A85 because the previous TAC allocations were outdated and required mid-season "reallocations" where one sector's quota would be transferred to another sector. 72 Fed. Reg. at 5654-55. In the years since its initial allocation among sectors, the Council frequently reallocated quota from the jig and trawl groups to hook and line sectors. North Pacific Fishery Management Council, Public Review Draft: Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis for Proposed Amendment 85 iii-iv and Table E-1 (March 12, 2006) (hereinafter "EA/RIR/IRFA")(AR Doc. 447)(noting that between 2000 and 2004, trawl CPs reallocated 19% of their sector's quota). Reallocations occur for a variety of reasons, including insufficient efforts by a sector and difficulties catching cod with trawl gear late in the year. Id. at iv.

In its problem statement, the Council noted that reducing the uncertainty in annual allocations would help those participants who have made significant capital investments and who rely on the BSAI Pacific cod fishery. 72 Fed. Reg. at 5657. The allocations in effect did not "correspond with actual dependency and use by sectors." Id. The Council stated it would use "catch history as well as consideration of socio-economic and community factors" as the basis for determining allocations. Id. In pursuing socioeconomic factors, the Council was particularly interested in expanding entry-level, local opportunities to fish cod that may be

under-represented due to the high fixed cost barrier to entry present in other fishing methods. Id.[1]

When it began its analysis, the Council considered several alternative options for what data should be used in determining the historical catch. AR Doc. 199 at 177 (listing potential ranges of years considered). The Council selected the most expansive set of years, choosing to analyze catch history data from 1995 to 2003. In April 2006, the Council voted to take final action and propose new sector allocations, including providing the non-AFA trawl CP sector with a 13.4% share of the TAC. North Pacific Fishery Management Council, Minutes of the 176th Plenary Session 20 (April 5-11, 2006) (hereinafter AR Doc. 131)(motion by McKie Campbell to revise percentages of cod allocated). On February 7, 2007, the NMFS published its proposed rule and request for comments. 72 Fed. Reg. at 5654. On September 4, 2007, it promulgated its final rule and provided published comments and responses. 72 Fed. Reg. at 50788. There were numerous comments addressing the allocation of cod to non-AFA trawl CPs. See, e.g., 72 Fed. Reg. at 50793 (Comment 3), 50795 (Comments 6 and 9),

---

[1] In full, the problems statement reads:
> The BSAI Pacific cod fishery is fully utilized and has been allocated among gear groups and to sectors within gear groups. The current allocations among trawl, jig, and fixed gear were implemented in 1997 (Amendment 46) and the CDQ allocation was implemented in 1998. These allocations are overdue for review. Harvest patterns have varied significantly among the sectors resulting in annual inseason reallocations of TAC. As a result, the current allocations do not correspond with actual dependency and use by sectors.
> Participants in the BSAI Pacific cod fishery who have made significant investments and have long-term dependence on the resource need stability, allocations should be adjusted to better reflect historic use by sector. The basis for determining sector allocations will be catch history as well as consideration of socio-economic and community factors.
> As other fisheries in the BSAI and GOA are incrementally rationalized, historical participants in the BSAI Pacific cod fishery may be put at a disadvantage. Each sector in the BSAI Pacific cod fishery currently has different degrees of license requirements and levels of participation. Allocations to the sector level are a necessary step on the path towards comprehensive rationalization. Prompt action is needed to maintain stability in the BSAI Pacific cod fisheries.

72 Fed. Reg. at 5657.

50796 (Comment 11), 50798 (Comment 16). The pre-A85 and post-A85 allocations can be summarized as follows (all numbers are a percentage of TAC):

| SECTOR | Pre-A85 | A85 | Average Retained Harvest (1995-2003) | Recent Average Retained Harvest (2000-2003) |
|---|---|---|---|---|
| Jig | 2.0 | 1.4 | 0.1 | 0.1 |
| Hook-and-line/pot-CV | 0.7 | 2.0 | 0.4 | 0.7 |
| Hook-and-line CV (60 ft +) | 0.2 | 0.2 | 0.1 | 0.3 |
| Hook-and-line CP | 40.8 | 48.7 | 49.1 | 49.4 |
| Pot CV (60 ft +) | 7.6 | 8.4 | 8.6 | 9.0 |
| **AFA Trawl CP** | **23.5** | **2.3** | 2.2 | 1.5 |
| **Non-AFA Trawl CP** | | **13.4** | 13.4 | 16.0 |
| Trawl CV | 23.5 | 22.1 | 24.0 | 21.6 |

72 Fed. Reg. at 5659, Table 3: Current and Proposed Allocations of BSAI Pacific cod non-CDQ TAC and Average Harvest Share by Sector (percent)(emphasis added). According to a data set different from the one captured above, the non-AFA trawl CP sector had an average of 17.7 percent of the retained harvest between 2004 and 2005. 72 Fed. Reg. at 5660, Table 4: Average Share (percent) of Retained Harvest 2004-2005.

On October 15, 2007, Plaintiffs filed their amended complaint. (Dkt. No. 6.) Count one of Plaintiffs' complaint asserts that A85 is not rationally related to the Council's stated goal and runs afoul of National Standard 4 of the Magnuson-Stevens Act. (Dkt. No. 6 at 21-22.) Count two argues that that A85 violates the AFA by failing to protect non-AFA vessels from the adverse affects of the AFA trawler vessels. (Id. at 22-23.) The parties' current motions only address these two counts. (Dkt. Nos. 45, 46.)

ORDER - 6

**Discussion**

**I. Jurisdiction and Standard of Review**

Pursuant to the Administrative Procedures Act ("APA"), findings of agency actions are reviewable by federal district courts. See 5 U.S.C. §§ 551-59, 701-706; see also Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife, 273 F.3d 1229, 1235 (9th Cir. 2001). In reviewing this type of regulation, the Court applies the two-step test articulated in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). First, the Court must inquire whether Congress has spoken to the precise question at issue. If it has, the Court must give effect to the unambiguously expressed intent of Congress. Id. The Court may look to the statute's language, history, and purpose, and may apply canons of statutory construction in ascertaining whether Congress has spoken directly and unambiguously to a particular issue. Id. at 843 n.9; Maine Ass'n of Interdependent Neighborhoods v. Comm'r, Maine Dep't of Human Servs., 946 F.2d 4, 6 (1st Cir. 1991). If the statute is ambiguous, the Court must determine whether the agency's interpretation of the statute is permissible. Chevron, 467 U.S. at 843. The parties here focus their arguments on whether the regulations were supported by a rational basis, Chevron's second step.[2]

If a regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," a district court may set aside the agency's action. 5 U.S.C. § 706(2)(A); see also Chevron, 467 U.S. at 844. The arbitrary and capricious inquiry asks whether the challenged agency presented a "rational connection between the facts found and the choice made." Arizona Cattle Grower's Ass'n, 273 F.3d at 1236. Though the standard is

---

[2] Plaintiff did argue in response to Defendant's motion that the Court does not need to determine whether the term "actual" in A85's problem statement is entitled to deference under Chevron because the MSA and its regulations are unambiguous. (Dkt. No. 59 at 9 and n.18.) However, as Defendant pointed out during oral argument, the problem statement is not within the purview of a Chevron step one analysis.

ORDER - 7

highly deferential to the agency, a court may find a regulation to be arbitrary and capricious if an agency relies on factors Congress did not intend for it to analyze, if it presents an explanation that is contrary to the evidence, or if it simply ignores an essential component of the problem. Yakutat, Inc. v. Gutierrez, 407 F.3d 1054, 1067 (9th Cir. 2005)(citations omitted).

## II. Disputed Issues

Pursuing the belief that "good fences make good neighbors," the NMFS's goal in dividing the TAC between different sectors is to create allocations that can be fished without incursion from competing sectors. 72 Fed. Reg. at 5655. Plaintiffs' central allegation is that the NMFS has arbitrarily moved their fence. The parties dispute (1) the relationship between A85 and its stated objectives, (2) the appropriateness of the data used, (3) whether improper political considerations influenced the decision-making process, (4) whether the Council balanced hardships, and (5) whether the Council adequately considered Plaintiffs' protections under the AFA.

### a. A85 and the Council's Problem Statement

For A85 to be valid, it must be consistent with the National Standards presented in the Magnuson-Stevens Act. 16 U.S.C. § 1854; see also Yakutat, 407 F.3d at 1058. The regulations implementing National Standard 4 require that motives for new allocations "justified in terms of the objectives of the FMP." 50 C.F.R. § 600.325(c)(3)(i)(A). Plaintiffs argue that, because A85 reduces the non-AFA trawl CP allocation from levels they enjoyed before the regulation, the changed quota fails to meet the stated objectives. (Dkt. No. 46 at 28.) They contrast the problem statement, which points out that pre-A85 allocations did not reflect "actual dependency and use," with their new regulations that reduce their share. 72 Fed. Reg. at 5657; (Dkt. No. 46 at 28.) Plaintiffs narrowly focus on this one clause at the expense

ORDER - 8

of a more comprehensive, coherent reading of the entire statement. While the final problem statement does begin describing, among other concerns, a discrepancy between allocations and actual use, it specifically provides that the basis for future allocations "will be catch history" and other socioeconomic considerations. 72 Fed. Reg. at 5657.

Plaintiffs further contrast NMFS's desire to decrease uncertainty with the uncertainty facing the non-AFA trawl CP sector in the aftermath of the regulation. (Dkt. No. 46 at 27-28.) Plaintiffs do not argue, however, that there will be industry-wide uncertainty after the new regulation. Rather, they argue that reducing the non-AFA trawl CP sector's allocation creates instability by reducing their ability to conduct a directed cod fishery. (Dkt. No. 46 at 28.) Again, Plaintiffs' reading of the problem statement is too narrow. Uncertainty as a concept has to be read in context of the goal of "comprehensive rationalization" of the BSAI allocations. 72 Fed. Reg. at 5657. Even if the non-AFA trawl CP sector must conduct a reduced directed fishery in the future, they have not explained how that creates inherent instability. They point to their lost revenue, but stability and profitability are two distinct concepts. (Dkt. No. 46 at 28.) Plaintiff has failed to demonstrate that the new regulations will lead to future instability beyond any adjustment in operations to match the new quotas.

  b. Data Analyzed

Plaintiffs' second factual allegation is that the Council failed to consider the most relevant data in developing the new allocations. (Dkt. No. 46 at 29.) Plaintiffs argue that the Council considered data that too old and no longer relevant to reallocation information and that the Council failed to consider the most recent, most relevant data available.

   i. Pre-1998 Data

First, Plaintiffs argue that older catch history data analyzed by the Council are irrelevant to the stated problem. They argue that any data collected before 1998 is

ORDER - 9

particularly misleading because catch regulations changed in 1998. (Dkt. No. 46 at 30(citing changes requiring 100% mandatory retention of cod).) In support, Plaintiffs point out that in the development A80, pre-1998 data was ignored because there was a concern the data would fail to best "represent the traditional harvest patterns of the [A]80 sector." (Dkt No. 59 at 9); 72 Fed. Reg. at 52688 (A80 Final Rule). The Council, however, stated its rationale for including the older data: 1995 was selected as a starting point because it immediately followed the first Magnuson-Stevens Act allocations. Memorandum from Robert D. Mecum, Acting Administrator, Alaska Region to William T. Hogarth, Assistant Administrator for Fisheries 2 (March 5, 2007)(hereinafter "AR Doc. 197"). Though the Council acknowledged that there were intervening events that may have changed the circumstances of the allocations (in particular the 1999 AFA legislation and 2001 attempts to protect the Steller sea lion), they determined that a smaller set of years would produce skewed results based on a too narrow view of market demand for cod in those years. Id. Furthermore, it is evident that the Council examined several potential data sets before selecting the range including 1995 to 1998. AR Doc. 199 at 177. Any selection of data inherently places one party at a disadvantage; Plaintiffs have failed to demonstrate how this selection of this data was arbitrary or capricious. In the Court's view, the Council's stated a permissible rationale for including pre-1998 data and nothing in the record of the Council's deliberations on this issue appears capricious or contrary to the evidence. Yakutat, Inc., 407 F.3d at 1067.

          ii.   2004-2005 Data

Second, Plaintiffs argue that the Council failed to adequately consider data from the two most recent catch years (2004 and 2005). (Dkt. No. 46 at 31-32.) National Standard 2 requires that management decisions be "based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

First, Defendant responds that 2004 and 2005 data was not available in the same format for the final two years and, thus, could not be used as the basis for historical catch. See 72 Fed. Reg. at 50793-94 (Comment 3 and Response). For 1995 to 2003, the Council had data from Federal Weekly Production Reports and Alaska Department of Fish and Game fish tickets. AR Doc. 199 at 366, Table 3-69; see also (Dkt. No. 45 at 23)(NMFS blend data and catch accounting database used for 2004 and 2005). The NMFS noted that using a set based on retained harvest from 1995-2003 was more accurate than using "blend data" from later years was appropriate because the latter is based on observer estimates. 72 Fed. Reg. at 50793. To use observer data would be inequitable because certain sectors, such as the AFA trawl CP group, are observed more carefully than others who would have to rely on extrapolated data. Id.

Second, Defendant argues that the Council did take into account data for 2004 and 2005, even if those numbers did not form the basis for the final historical catch numbers. (Dkt. No. 58 at 3.) A review of the Secretarial Review Draft of A85 demonstrates, data from 2004 and 2005 were analyzed. AR Doc. 199 at 272. The Council noted that the non-AFA trawl CP sector had a harvest share in 2004 that was greater than any other year. Id. at 273. However, the NMFS noted that, despite this increased in harvest, the higher 2004 and 2005 numbers did not mean that the combined trawl CP sector was catching its entire allocation. 72 Fed. Reg. at 50794.

The Court finds that the Secretary's stated reasons for selecting the data are entirely appropriate. The need to maintain consistency in data and treat all sectors equally is an ample

ORDER - 11

justification for using the 1995-2003 data. The Court finds that the Secretary's decision in this regard was neither arbitrary nor capricious.[3]

        c. Arbitrary Political Considerations

Plaintiffs point to the Council's treatment of the *Katie Ann*, an AFA trawl CP vessel, for the argument that inappropriate political considerations interfered with rational decision making. Regulations that are "a product of pure political compromise" in the absence of scientific justification will generally be viewed as arbitrary and capricious. Midwater Trawlers Co-operative v. Dept. of Commerce, 282 F.3d 710, 720-21 (9th Cir. 2002). While the Council had initially considered allocating 1.5% of the TAC to the AFA trawl CP sector, they increased the quota to this sector to 2.3% based, in part, on the concern that the *Katie Ann* would not be able to maintain its directed cod fishery. Transcript of BSAI A85 Council Meeting at 37 (April 8-9, 2006)(AR Doc. 203). In other words, absent an increased allocation, ships like the *Katie Ann* would only be able to catch cod as bycatch during their directed Pollack fishery. Id. at 38. A Council member noted there were "negotiations and discussions" that lead to the increased allocation. Id. at 37. Plaintiffs claim their exclusion from such negotiations made the process improperly political. (Dkt. No. 46 at 33; Dkt. No. 59 at 4.) Reading the record as a whole, it is clear that the Council considered not just the *Katie Ann* in the context of maintaining a directed cod fishery, but the sector as a whole and its historic use. See AR Doc. 203 at 38 (Salverson: "my concern . . . was not to provide for a directed fishery for any one vessel . . . but rather that the allocation . . . was not reflective of the historical usage."). Thus, political concerns did not predominate as they did in Midwater Trawlers Co-operative. 282 F.3d at 720-21.

---

[3] The Court further notes that Plaintiffs' argument fails to consider the socioeconomic factors that the Secretary was required to assess in accordance with the Problem Statement.

ORDER - 12

d. Relative Hardships

Plaintiffs contend that the new allocations violate National Standard 4 of the Magnuson-Stevens Act because they are not "fair and equitable to all." 16 U.S.C. § 1851(a)(4). The regulations state that "the Council should make an initial estimate of the relative benefits and hardships imposed by the allocation." 50 C.F.R. § 600.325(c)(3)(i)(B). However, the EA/RIR/IFRA demonstrates that the Council did consider the impact of the changes on the non-AFA trawl CP sector. See EA/RIR/IFRA (AR Doc. 447) at 169-171. Further, the responses to the comments published with the final rule show that the NMFS determined that the non-AFA trawl CP sector would be able to maintain a directed cod fishery. See 72 Fed. Reg. at 50799, 50801. The National Standards do not require any particular outcome with respect to allocations; rather, they provide a framework for the Council's analysis. The Council fulfilled its obligations under the framework by analyzing the impact of the new allocations on the non-AFA trawl CP sector. The Court believes that none of the Secretary's actions on this issue were arbitrary or capricious.

e. Failure to Protect from AFA Impacts

The AFA requires that the Council shall manage the BSAI in a way to protect non-AFA vessels from adverse impacts of the directed pollock monopoly. 16 U.S.C. § 1851, note. Plaintiffs argue that by constructively increasing the AFA trawl CP sector's allocation while reducing the non-AFA trawl CP sector's, the Council compounded the adverse effects of the AFA. Defendants simply point out that the increase over historical levels was needed to allow AFA boats to continue a directed cod fishery and retain their harvest of other fish (where cod is caught as by-catch). AR Doc. 203 at 37. A comparison of pre-A85 quotas with A85 allocations is instructive. Before A85, the trawl CPs were one sector allocated 23.5% of the TAC. See 72 Fed. Reg. at 5659. A85 divided this sector in two between AFA and non-

AFA vessels, providing the non-AFA boats with a much larger allocation than their AFA counterparts (13.4% vs. 2.3%). In other words, if the Court analyzes the issue from the perspective of total trawl CP catch before A85, the AFA sector bore the brunt of the overall reduction in trawl CP allocations presented in A85. The Council has, therefore, not run afoul of the AFA's requirement to protect non-AFA vessels.

## Conclusion

The Court understands that the change in the allocations has had a significant impact on Plaintiffs' vessels. The fact that they may not pursue as large a directed cod fishery in the future is, alone, not a sufficient justification for overturning the amendment. The Court does not believe the Secretary has acted arbitrarily or capriciously in developing A85. The Court further finds that A85 is supported by a rational basis. Therefore, the Court hereby GRANTS Defendant's motion for summary judgment and DENIES Plaintiffs' motion for summary judgment on counts one and two of Plaintiffs' complaint.

The clerk is directed to send a copy of this order to all counsel of record.

DATED this 12th day of November, 2008.

s/Marsha J. Pechman
HONORABLE MARSHA J. PECHMAN
United States District Court Judge